## CONTINUATION OF APPLICATION FOR SEARCH WARRANT

I, Gregory Parrott, being duly sworn, depose and state that:

## INTRODUCTION

1. I make this continuation of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property as described in Attachment A - that is currently in the possession of law enforcement, and the extraction of electronically stored information from that property as described in Attachment B.

2. I am a Task Force Officer with the United States Drug Enforcement Administration, United States Department of Justice, and have been so since March 2020. I am currently assigned to the Grand Rapids District Office in the DEA's Detroit Field Division. I have been a police officer with the Lansing Police Department for approximately 19 years, 3 of which I was assigned as an investigator with the Lansing Police Special Operations Section (SOS), which is tasked with investigating narcotics trafficking. During my time as a SOS Investigator, I have participated in investigations of unlawful drug trafficking and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and also made several narcotic purchases in an undercover role. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect, lingo, and coded

language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the Federal and State controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); use of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b), conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C.§ 1957.

3. I respectfully submit that there is probable cause to believe that Jerreka Sherese Rutledge has engaged in the distribution of, and in the possession with intent to distribute cocaine, contrary to 21 U.S.C. § 841(a). I also submit there is probable cause she has possessed a firearm and ammunition despite her status as a felon, contrary to 18 U.S.C. § 922(g)(1). I further submit that there is probable cause to believe that evidence of these offenses will be found on the Device described in Attachment A.

4. The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses. This continuation is intended to show merely that

there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. This continuation supports the application of the warrants to search property currently in the possession of law enforcement, hereinafter collectively referred to as "the **Device**":

- **Device 1** – Black Apple iPhone with black and red case, serial #F2LCJA1MN706, Model #MWH22LL/A2161, phone number 469-580-3182.

6. The **Device** is currently located at the Lansing Police Department (5815 Wise Rd, Lansing, MI, 48911). The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B. State and local officials are already in the process of performing data extractions on the Device pursuant to a state search warrant. The purpose of this affidavit is to establish probable cause to search the Device for evidence of the above-mentioned federal criminal offenses.

## PROBABLE CAUSE

### Police find Jarreka Rutledge's phone in the same room as cocaine, gloves, a digital scale, and ammunition.

7. On October 6, police executed a state search warrant at 5017 Connors Ave. in Lansing, Michigan. This was the home of a Jarreka Rutledge and her boyfriend, Darniko Terry.

8.      Police found Jarreka Rutledge's phone on the kitchen table of her home. Rutledge told police that the phone was hers and that her phone number was 469-580-3182. On the same table, there was a box of blue nitrile gloves, which I know, from training and experience, drug dealers often wear to protect their hands from narcotics while they package narcotics for sale. On the kitchen counter, I found a pan with about 95 grams of a white powdery substance and about 6 grams of a chunky rock substance, both of which field tested positive for cocaine. Next to the pan with the cocaine inside it was a black digital scale that had white powder residue on top of it. That residue also tested positive for cocaine. Within arms' reach of the pan and the scale was a bottle of Inositol powder, which I know, from my training and experience, drug dealers often use as a cutting agent to dilute powder cocaine before they sell it. Besides this, there was $1,900 in cash on the counter, and there was one unspent round of .45 caliber ammunition, all within arms' reach of the pan and the scale and the inositol powder. I know, from my training and experience, that drug dealing is a cash business, and that guns and ammunition are tools that drug dealers use to protect their drug supplies and the money they make from selling drugs.

9.      I also know, from my training and experience, that cell phones can be tools of the drug trade too. Dealers sometimes use them to communicate with suppliers using voice call and messaging applications. They sometimes use the same apps to communicate with customers. Sometimes, drug dealers also use payment apps like Venmo, Cash, WesternUnion, and MoneyGram to pay for drugs and take payment for the drugs they sell. Drug dealers can also use phones to shop for guns

and ammunition on the internet – they sometimes use social media apps to bid on and purchase such items.

10.     Based on the phone's close proximity to cocaine and to tools used in the cocaine trade (gloves, a digital scale, inositol powder, $1,900 and a .45 caliber ammunition round), and based on what I've just described above about how drug dealers use cell phones, I submit there is probable cause that the phone was also a tool used to engage in the cocaine trade from within Rutledge's home.

### Rutledge and her boyfriend were likely working together.

11.     I mentioned earlier that police were executing a search warrant when they found Ms. Rutledge's phone. The reason that they were searching her home was because, earlier that same day, someone with Darniko Terry's height and build had walked out of the home, gotten in a vehicle, drove to a prearranged location, and sold cocaine to a confidential informant. Hence, police suspected Terry of selling cocaine.

12.     There was evidence in the house that confirmed what police suspected. In the bedroom that Rutledge and Terry shared (according to her), police found a Glock 19 9mm handgun, a box of Federal 10mm ammunition containing 18 unspent rounds, and $614 in cash in the pants pocket of a pair of men's jeans (size 42 in. 33 in.) Terry is about 5 feet 7 inches tall and weighs about 200 pounds, so it looks like these jeans belonged to him.

13.     Other evidence connected Rutledge to nearly $10,000 in what appeared to be drug proceeds. Rutledge admitted to police that Terry was unemployed, that she herself was unemployed, and that she hadn't had a job since 2019. Her only

source of income, according to her, was $160 per week in unemployment benefits. Even so, police found $3,025 in cash in her purse, and Rutledge claimed ownership of another $6,000 in cash, banded into three even stacks of $2,000 each, that police found in a closet. She claimed to have been withdrawing the money from her bank and saving it in her closet. This money was separate from the $1,900 in cash police found in the kitchen near Rutledge's phone.

14. Rutledge also told police that she had no knowledge of any drug dealing activity occurring in her house, even though the above kitchen items were found either right on her kitchen counter or right on her kitchen table.

### Other phone evidence links Rutledge's phone number to illegal gun possession.

15. During the search of Rutledge's home, police collected four other cell phones aside from Rutledge's (Lansing Police Department evidence #41, 42, 43 & 44). I obtained a federal search warrant for the contents of these other devices, which was signed by Judge Sally J. Berens of the United States District Court in the Western District of Michigan on October 30th 2020 at 0950 hours.

16. After the warrant was authorized, I conducted an initial examination of the four other phones. I found that one of the phones (Lansing Police Department evidence #41) had received text messages from 469-580-3182, which is the same number that Rutledge told police was assigned to Device 1. In the searched cell phone, Rutledge's number was saved under the contact "Reka," which is consistent with the last two syllables of Rutledge's first name, Jarreka.

17. One text exchange contained evidence that showed Rutledge likely possessed a firearm, despite her status as a felon. On 9-5-2020 at 5:15:08 pm, **"Reka"** sent a the searched cell phone (LPD Evidence #41) a photo of an open gun box with a black handgun in the box. Immediately following the picture being sent, "Reka" sent an additional message on 9-5-2020 at 5:15:34 pm "My new baby." LPD evidence #41 then responded to "Reka" on 9-5-2020 at 5:27.30 pm "That's wassup."

### Criminal History

18. Rutledge and Terry both have prior felony convictions:

    a. Darniko Raynal Terry previously pleaded guilty to 2 counts of Felony Controlled Substance-Del/MFG (Cocaine, heroin or another narcotic) less than 50 grams on April 17, 2019 in the 30th Circuit Court.

    b. Jerreka Sherese Rutledge previously pleaded guilty to Felony Carrying Concealed Weapon on January 14th, 2020 in the 30th Circuit Court.

### Rutledge's phone likely contains evidence of drug dealing and gun possession.

19. Based on all of the above facts I submit there is probable cause that the money Rutledge claimed as her own is actually proceeds from the sale of cocaine. And based on this inference, I submit there is probable cause that she and Terry were working together to distribute cocaine for profit, contrary to 21 U.S.C. §§ 841(a) and 846, and that she possessed with intent to distribute cocaine, contrary to 21 U.S.C. § 841(a).

20. Through discussions with the United States Attorney's Office for the Western district of Michigan, I am aware that the legal concept of *possession* includes both sole and joint possession, and that possession can be actual or constructive. While police did not find Rutledge in actual, immediate possession of the firearm or ammunition that were inside her home, the police did find all of these items in areas over which she had access and control. These items were not hidden or secret, so Rutledge likely had knowledge and awareness of the items. (The Glock was in plain view beside Rutledge's bed, the 10mm ammunition was in a bedroom drawer, and the .45 caliber round was on the kitchen counter). I submit the above facts and observations establish probable cause that Rutledge was in joint possession of the firearm and ammunition, and has, therefore, committed the offense of felon in possession of a firearm and ammunition, contrary to 18 U.S.C. § 922(g)(1).

21. The text messages sent from Rutledge's phone number further support this conclusion. Rutledge's claim "My new baby" sounds like a claim of ownership of the firearm depicted in the photo sent from her phone number.

22. Based upon my training, experience, and participation in firearms investigations, drug investigations, and financial investigations relating to drug investigations, I am aware of the following:

    a. Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their phones;

b.  Drug traffickers often purchase firearms for protection, to intimidate and to carry out violent shootings relating to the drug trafficking.

c.  Drug traffickers often are unable to legally obtain firearms and buy "street guns" which are purchased from individuals on the street for cash or on trade for drugs.

d.  Drug traffickers often use their phones to send messages negotiating the price of firearms and include pictures of the firearms which they store on their phones;

e.  Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their phones;

f.  Drug traffickers often maintain, on hand, large amounts of currency in order to maintain and finance their on-going narcotics business;

g.  Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking;

h.  User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the Device is being used by a drug trafficker and can provide other useful evidence to the drug investigation;

    i.      Drug traffickers often use the internet to look up various information to support their drug trafficking activities;

    j.      Drug traffickers often have unexplained wealth and assets as they do not have a job, nor do they report income on their state or federal tax returns. Subjects often use cash, money orders, and cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming from. Subjects will place assets in the names of nominees, which are often friends and family members in an attempt to hide the true ownership of the assets. It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including their phones;

    k.      It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds. This evidence includes electronic records of financial transactions, which are often stored on mobile phones and computers.

l. When drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency.

m. The sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money").

n. It is common for drug traffickers to separate their "street money" by denomination and organize this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting.

o. That drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. The "source" of their income reported on tax returns can be falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses.

p.  Drug traffickers often use services such as Western Union, Moneygram, Venmo, CashApp and others in order to disguise and/or launder their narcotics proceeds and expenditures. The services can be downloaded onto mobile phone and computing device in the form of Apps. These services can be used to wire money to sources of supply, distributors, and co-conspirators day and night from the device with anonymity. However, when downloaded to a phone, these applications often contain records that chronicle transactions performed on that device.

q.  Courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

r.  Drug traffickers frequently receive their supply of drugs through packages sent by U.S. Mail or third-party delivery service.

s.  Drug traffickers often use social networking applications such as Facebook and Facebook Messenger to shop for and purchase firearms and ammunition so that they can have weapons on hand to protect their drug supplies and drug proceeds.

23. Based on these observations, I submit that there is probable cause Rutledge's phone will contain evidence of drug dealing and evidence of the possession of firearms and ammunition.

## Technical Terms

24.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b.    Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.

> Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can

        contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.    PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication device and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same

    capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

  f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

  g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

25. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that Device 1 has capabilities that allow it to serve as a wireless telephone,

digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on a device of this type can uncover, among other things: (1) evidence that reveals or suggests who possessed or used the device; (2) evidence of communications regarding the purchase, storage, and distribution of controlled substances; (3) evidence of the purchase, possession, and maintenance of firearms in order to protect drug supplies and drug proceeds; (4) the purchase, storage, and/or distribution location(s) of drugs and/or firearms; (5) the identity and contact information of key personnel within a drug distribution network; and (6) financial evidence concerning drug proceeds and attempts to launder drug proceeds in order to avoid law enforcement detection.

## Electronic Storage and Forensic Analysis

26. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device used to access the Internet. This information can sometimes be recovered with forensics tools.

27. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how Device 1 was used, the purpose of the use, who used Device 1, and when. There is probable cause to believe that this forensic electronic evidence might be on Device 1 because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how the device was used, the purpose of use, who used the device, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of Device 1 consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of Device 1 to human inspection in order to determine whether it is evidence described by the warrant.

29. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

30. I submit that this affidavit establishes probable cause that Jerreka Sherrese Rutledge has violated 21 U.S.C. § 846 by working with Darniko Terry to sell cocaine for profit. I submit that this affidavit also establishes probable cause that Rutledge has violated 21 U.S.C. §841(a) by possessing with intent to distribute cocaine. In addition, I submit that this affidavit also establishes probable cause that Rutledge violated 18 U.S.C. § 922(g) by possessing a firearm and ammunition as a convicted felon. I further submit there is probable cause for a search warrant

authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.